# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

**STACY HORNBUCKLE BARTON**   ***CIVIL ACTION NO. 14-3229**

**VERSUS**                                   ***MAGISTRATE JUDGE WHITEHURST**

**COMMISSIONER OF SOCIAL**      ***BY CONSENT OF THE PARTIES**
**SECURITY**

## REASONS FOR JUDGMENT

The undersigned was referred this social security appeal by consent of the parties.

For the reasons set forth below, the Commissioner's decision is **REVERSED**, and

claimant is awarded benefits as of June 4, 2012, the date her application was filed.

## I. Background

Stacy Hornbuckle Barton ("Barton"), born in 1970, filed an application for

supplemental security income ("SSI") on June 4, 2012, alleging disability as of June 1,

2007, due to bipolar disorder, adjustment disorder with mild anxiety, anxiety disorder,

umbilical hernia, fibromyalgia, and hepatitic C.

Barton was a high school graduate. (Tr. 62). She had taken a number of college

courses in early elementary education and criminal justice at the University of Louisiana-

Lafayette, but did not graduate. (Tr. 62, 654, 815). She trained as a medical assistant in

Dallas, Texas, then worked in that field until her divorce. (Tr. 62-63).

Afterwards, claimant moved back to Lafayette, Louisiana, and worked for 10 years

as an accountant. (Tr. 655). Her last full-time job was as an office assistant in 2009.

Barton had a history of alcohol, cocaine and prescription drug abuse.  She went through treatment and stopped using cocaine in about 2009.  (Tr. 59).  She had a relapse in 2010.  (Tr. 64).

In 2011, claimant briefly worked at a fast food restaurant, but was fired because she could not keep up due to her bipolar problems.  (Tr. 64).  She was diagnosed with hepatitis C in 2012, and became quite ill and fatigued from the treatment regimen.  (Tr. 65).  The treatment also increased her pain from fibromyalgia.

In 2013, claimant obtained a part-time job at Hancock Fabrics.  (Tr. 60, 74).  She could not keep up because of her problems with focusing and concentrating, and was terminated.  (Tr. 75, 188, 816-17).  She took bipolar disorder medications, which controlled her symptoms somewhat.  (Tr. 72).

Claimant had been homeless, but was living in the Three-Quarterway House.  (Tr. 61, 66).  She had a driver's license, but did not own an automobile.  She shopped for herself, cooked simple meals, did laundry, read meditation books, and attended AA meetings three or four times a week.  (Tr. 77, 79-80).

The medical records reflect that claimant had been treated since 2008 at the Joseph Tyler Mental Health Center ("TMHC") by Dr. Lindsay Legnon, a psychiatrist, and Brenda Cary, a social worker.  (Tr. 354-440, 735-48, 797-811, 823-24).  Her diagnoses

were biopolar I disorder, unspecified; polysubstance dependence, and anxiety disorder, not otherwise specified.  (Tr. 355).

On December 11, 2008, claimant was admitted to University Medical Center ("UMC") for alcohol and drug detoxification.  (Tr. 530-33).  She was found to be hepatitis C positive on routine labs.  (Tr. 531).  She was referred for a 28-day follow-up program at ARC.

Claimant's condition waxed and waned throughout 2009 and 2010.  She was compliant with treatment on April 9, 2009 (Tr. 410), and August 31, 2009  (Tr. 404). However, on September 30, 2009, she reported increased anxiety, restless sleep, and upsetting dreams.  (Tr. 403). Then, she was doing "really" well October 23, 2009.  (Tr. 402).

On December 16, 2009, claimant reported being "in a funk" and not meeting her boss's expectations.  (Tr. 401).  She had let her job go at the Grand Theater.

Claimant complained of emotional dys-regulation, self-criticism and depression on January 13, 2010.  (Tr. 400).  On February 11, 2010, she was doing much better.  (Tr. 398).  She was not depressed, and able to concentrate and function.

On July 26, 2010, claimant presented to UMC stating that she had been off of all of her depression and anxiety medications for several days because she had run out of refills.  (Tr. 588-91).  She requested detox for cocaine and alcohol abuse.

On August 17, 2010, claimant was admitted to the Detox Unit at UMC for addiction to opioids, cocaine, and alcohol.  (Tr. 516-28).  She left against medical advice.  (Tr.  520-21).

On January 3, 2011, claimant reported inability to focus and feeling "really down."  (Tr. 394).  She had remained sober since October 21, 2010.

On February 15, 2011, claimant presented to Our Lady of Lourdes Hospital ("Lourdes") with abdominal pain from an umbilical hernia which had been present for several years.  (Tr. 313).  She had decided to get it repaired, if possible.  She was unable to complete the surgery because her BMI was too high.  (Tr. 374).

Claimant was admitted to Acadia Vermilion Hospital on March 6, 2011, after taking a friend's Elavil with her sleep medications.  (Tr. 389).  She complained of seeing snakes.  Her discharge diagnoses were bipolar disorder, depressed; polysubstance abuse, and alcohol dependence.

On July 26, 2011, claimant wanted to see another doctor at TMHC about seeing snakes.  (Tr.  383).  On August 5, 2011, she told Dr. Legnon that she had been seeing dark, snake-like shadows in the corner of her eye and going behind furniture for awhile.  (Tr. 382).  She endorsed thought broadcasting and passive suicidal ideations without any intent or plan.

On October 9, 2011, claimant was admitted to UMC by a coroner's emergency certificate.  (Tr. 468-502).  She reported that she had over-medicated with Xanax,

4

Effexor, Trileptal, Lortab and Soma.  (Tr. 472).  She denied suicidal or homicidal ideations.

On December 6, 2011, claimant was admitted to University Medical Center ("UMC") for an umbilical hernia.  (Tr. 460, 571).  Repair surgery was not carried out because of contraindication (BMI too high).  (Tr. 459, 462).

On March 19, 2012, Barton reported six months' sobriety from street drugs and alcohol, but was abusing her prescribed pain medication.  (Tr. 373).  On May 3, 2012, she was doing relatively well, despite the physical toll of treatment for hepatitis C.  (Tr. 370). She had normal speech, full affect and no psychosis.

On July 31, 2012, claimant reported that she had required blood transfusions for anemic hepatitis C.  (Tr. 368, 450-57).  Dr. Legnon stopped Effexor and Buspar to decrease her risk of bleeding, but continued Lithium.

David Greenway, Ph.D. (psychology), performed a consultative examination on October 15, 2012, at the request of Disability Determination Services ("DDS").  (Tr. 654-56).  Barton complained of being very confused, very panicked and anxiety-filled, and of difficulty sleeping and poor appetite.  (Tr. 655).  She indicated that her bipolar disorder symptoms were moderately well-controlled by psychotropic medication.

Claimant's verbal behavior was of normal rate and volume.  She had no evidence of a formal thought disorder.  She had no speech problems.

Receptive skills were good.  Affective expression was generally nervous.  Insight and judgment were minimally adequate, and social skills were adequate.

During interviewing, claimant was alert and oriented.  (Tr. 656).  Recent and remote memories were intact.  Behavioral pace was even with consistent effort.  Overall, intelligence was estimated in the average range of intellectual functioning.

Dr. Greenway's diagnoses were biopolar disorder, per patient history; adjustment disorder with anxiety, mild, and polysubstance abuse.  Claimant's Global Assessment of Functioning ("GAF") score of 65 for the previous year.  She had a minimally functioning lifestyle, and mild anxiety symptoms related to change in life circumstances.

Dr. Greenway determined that claimant's activities of daily living were mildly impaired due to her physical health complaints.  She reported that her primary cause of disability was her hepatitis C treatment, which she described as "exhausting."  She had responded well to mental health treatment in the past.  Her mental health status was normal.

Additionally, Dr. Greenway noted that claimant had been successfully employed while in mental health treatment.  She had no indication of significant deterioration of functioning from a previously higher level.  Dr. Greenway opined that if claimant remained sober, she should be able to maintain competitive employment similar to her past work experience.  She should be able to understand, remember and carry out relatively detailed instructions, and maintain attention to perform simple repetitive tasks

6

for two-hour blocks of time.  She should be able to tolerate mild work-related stress and sustain effort and persist at a normal pace over the course of a routine 40-hour workweek. Her social skills were minimally adequate for workplace interactions.

On October 30, 2012, claimant complained to her social worker at TMHC that her bipolar was "out of control," and her nerves were "really bad."  (Tr. 746).  She reported that she was not sleeping, and was again seeing things scurrying behind the couch, TV and bookshelf.  She was hepatitis-free.

On December 12, 2012, Barton was admitted to Opelousas General Hospital ("OGH") after taking 17 Tramadol and five Xanax.  (Tr. 708).  She was upset because her doctor would not give her a prescription for Lortab, so she was trying to take more Tramadol equal to her regular Lortab dose.  She denied that she was attempting to harm or kill herself.  It was unclear whether this was a suicide gesture or genuine suicide attempt.  (Tr. 711).  On examination, her mood and affect were normal.  (Tr. 712).

On February 16, 2013, claimant presented to OGH with complaints of anxiety attacks, fibromayalgias, rectal bleeding, an upset stomach from increasing Advil, and taking her mother's Lortab for pain.  (Tr. 685-87).  She had a disheveled and poorly kept habitus.  (Tr. 688).  She had abnormal speech with rapid evasive minimizing.  She exhibited a number of paranoid thoughts.  She was quite agitated, and had an unpredictable mood.

The diagnoses were panic attack, obesity, opioid abuse, chronic drug abuse, and somatization disorder.  (Tr. 687).  Claimant was prescribed Mylanta, Donnatal, Lidocaine Viscous, Pepcid, and Geodon.  She was upset that she did not receive a prescription for pain medications, and refused her written prescriptions, stating that she already had medications for depression and a prescription for Prilosec.  (Tr. 690).

On February 25, 2013, claimant complained to Ms. Cary that the hepatitis C treatment had left her with neurological damage.  (Tr. 743).  She reported that her psychological medications were not helping her racing thoughts, and that she could not focus or make decisions.  However, her medications were helping her sleep and awake refreshed.

On March 2, 2013, claimant presented to OGH with anxiety.  (Tr. 683).  She left without notice.

On May 7, 2013, claimant complained of "crazy" sleep, "bad anxiety," "no energy, depressed, not taking showers like before or putting makeup on," and "[n]o task completion."  (Tr. 807).  She had also noticed an increased need to move, mostly at night. Dr. Legnon noted that her severity of symptoms was "marked," and that her global improvement was "minimally worse."  (Tr. 808).  She increased claimant's Geodon and continued Lithium.

On July 11, 2013, claimant told Dr. Legnon that she planned to go into ARC recovery center for 30 days due to recent marijuana and opiate use.  (Tr. 803).  She had

last smoked marijuana two days prior.  She had been taking up to 6 Lortab at a time until five days before.  She reported increased sleep latency and anxiety during the day.  She had not been taking Geodon, and had failed to complete her Lithium lab.

Claimant's mood was anxious, and speech was rapid.  (Tr. 804).  Her severity of symptoms was "moderate," and global improvement was "minimally worse."

On July 18, 2013, claimant was admitted to UMC after an attempted overdose of prescription medication.  (Tr. 757).  She complained of seeing black, snakelike things.  (Tr. 759).  She had been kicked out of a shelter the day before.  The impression was suicidal ideations and major depression.  (Tr. 760).

Claimant presented for aftercare at TMHC on August 15, 2013.  (Tr. 800).  She was requesting Trazodone for sleep.  Her mood had been irritable/angry.  Dr Legnon continued her discharge medications of Cymbalta, Saphris and Elavil, and added Trazodone to improve sleep.  (Tr. 801).

On September 11, 2013, Dr. Legnon noted that claimant's symptoms were moderate, mood was anxious, speech was rapid, and thoughts were tangential.  (Tr. 804).  Her global improvement was minimally worse.

On October 11, 2013, claimant told Dr. Legnon that she was doing really well.  (Tr. 798).  She had been sober for two months and 22 days.  Her only mild complaint was some difficulty with sleep and concentration.  Her Trazodone was increased as needed for insomnia.  (Tr. 799).

On October 30, 2013, claimant presented at UMC with complaints of abdominal pain and fibromyalgia.  (Tr. 782).  She was referred to the surgery clinic for possible hernia repair.  (Tr. 783).

On December 15, 2013, claimant was evaluated by Naomi Friedberg, Ph.D., at the request of claimant's counsel.  (Tr. 813-20).  Her mood and affect were notably anxious and depressed.  (Tr. 813).  She reported that her anxiety and depression level seemed to be higher lately due to difficulties sleeping and decreased appetite.

Claimant had been sober from opiates and Xanax since July 2013, and alcohol and cocaine for five years.  (Tr. 814).  She had had some relapses while trying to cope with the sleeplessness and anxiety resulting from Interferon treatment for hepatitis C.

After evaluation, Dr. Friedberg diagnosed claimant with bipolar I disorder, with mixed features; polysubstance dependence (in reported remission for five months), and anxiety disorder, unspecified.  (Tr. 816).  Dr. Friedberg opined that claimant's ability to understand, remember, and carry out simple, moderate and detailed instruction would be negatively impacted by the severe and persistent symptoms of her long-standing bipolar disorder.  Additionally, her mood, judgment and behavior were complicated and negatively impacted by numerous factors across her life-span, including prescription and illicit drug and alcohol use, homelessness, poverty, medical illnesses, and Interferon treatment, which was known to cause or worsen mental health symptoms.

10

Claimant told Dr. Friedberg that during the evaluation with Dr. Greenway, she had been emotionally more stable and feeling a bit more hopeful.  However, her moods fluctuated frequently and intensely, with only marginal relief from psychotropic medications, negatively impacting her consistency in adaptive functioning.  Dr. Friedberg determined that claimant's ability to maintain attention to perform simple repetitive tasks for two-hour blocks of time, and ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek, would be "greatly negatively impacted" by her fluctuating mood swings.

Dr. Friedberg opined that claimant had difficulty relating to others due to her intense mood swings, anxiety and low frustration tolerance.  (Tr. 817).  She was polite and cooperative during the evaluation process, but her high level of anxiety was notable, and she cried intermittently while talking about her abuse as a child, troubled teen years, substance abuse, father's death, and poor relations with her mother.

On January 13, 2014, Dr. Legnon completed a Mental Functional Capacity Assessment.  (Tr. 823-24).  She opined that claimant had mild or no limitations as to her ability to remember locations and work-like procedure; understand and remember simple instructions; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions.  (Tr. 823-24).  She had the following functional limitations, however, either more than 50% of a work week, or between 25 to 50% of a work week: understand and

remember detailed instructions; maintain attention and concentration for two-hour blocks of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary work routine without special supervision; work in coordination with or proximity to others without being distracted by them; make work-related decisions; complete a normal work-day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them, and respond appropriately to changes in a work setting.  (Tr. 823-24).  Dr. Legnon believed that these limitations were primarily the result of her diagnosis, not alcohol or drug abuse.  (Tr. 824).

## II. Law and Opinion

On appeal, Barton argues that: (1) the AL erred at step two of the sequential evaluation process in failing to find that her umbilical hernia was a severe impairment; (2) the ALJ's evaluation of the medical evidence is not supported by substantial evidence; (3) the ALJ violated 20 C.F.R. § 416.927(c) and SSR 96-2p in failing to give controlling weight to the opinions of her treating psychiatrist, Dr. Legnon, and further erred in failing to weigh her opinions using the factors listed in § 416.927(c); (4) the ALJ failed to properly weigh the opinions of Drs. Greenway and Friedberg under 20 C.F.R. § 416.927, given the chronology of their respective evaluations and the ALJ's own assessment of her

functioning in 2012 and 2013; (5) the ALJ's RFC assessment fails to account for all of her functional limitations, including the effects of her hepatitis C treatment and umbilical hernia; (6) the ALJ's step two finding that claimant has severe mental impairments and the ALJ's RFC assessment including limitations legally synonymous with non-severe mental limitations are mutually exclusive findings indicative of legal error, and (7) the ALJ erred in failing to obtain vocational expert testimony regarding the effect of her significant non-exertional impairments on the occupational base.

## A. Was Claimant's Umbilical Hernia a Severe Impairment?

As to the first argument, Barton asserts that the ALJ's finding that her umbilical cord hernia was not a severe impairment at step two of the sequential evaluation process is contrary to law, citing *Loza v. Apfel*, 219 F.3d 378, 390 (5th Cir. 2000), and *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

In *Loza*, the Fifth Circuit reiterated the nonseverity standard set forth in *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), as follows: "[A]n impairment can be considered as not severe *only if it is a slight abnormality [having] such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work*, irrespective of age, education or work experience."  (emphasis added).  *Id.* at 391 (*citing Stone*, 752 F.2d at 1101).  In censuring misuse of the severity regulation, the court in *Stone* forewarned that the Fifth Circuit would "in the future assume that the ALJ and the Appeals Council have applied an incorrect standard to the severity requirement *unless*

*the correct standard is set forth by reference to this opinion or another of the same effect,*

*or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) is*

*used.*"[1]  (emphasis added).  *Loza*, 219 F.3d at 391 (*quoting Stone*, 752 F.2d at 1106).

Here, the ALJ found *no* evidentiary support for claimant's allegations regarding

her hernia problems.  (emphasis added).  (Tr. 31).  She noted that the records did not

disclose any imaging, diagnostic findings, or treatment records from any medical source

for this condition.

However, the records from Lourdes show that on February 15, 2011, claimant

presented with abdominal pain from an umbilical hernia which had been present for

several years.  (Tr. 313).  She was unable to complete the surgery because her BMI was

too high.  (Tr. 315, 374).

Additionally, records from UMC show that claimant was  referred for an umbilical

hernia on December 6, 2011.  (Tr. 571).  She was scheduled for surgery on January 4,

2012, but it was not performed because her BMI was too high.  (Tr. 459-62).  She

complained that her hernia had been "extremely painful" over the last six months.  (Tr.

460).

On February 16, 2013, Dr. Patrick Gillespie found no abdominal or inguinal hernia

on examination.  (Tr. 688).  However, on October 30, 2013, claimant continued to

---

[1]Section (c) of 404.1520 provides in part: "[i]f you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."

complain of abdominal pain, and was referred to UMC's surgery clinic for possible hernia repair.  (Tr. 782-83).  At the hearing on December 12, 2013, claimant complained that she had problems with her unrepaired hernia which required her to wear "loose and elastic" clothing and caused difficulty with bending and lifting.  (Tr. 78).

At this point, the records are unclear as to the status of claimant's umbilical hernia. However, because I find that the ALJ erred in assessing the mental health providers' opinions, this issue need not be addressed.[2]

## B. Did the ALJ Properly Evaluate the Opinions of Claimant's Treating and Examining Physicians?

Claimant argues that the ALJ failed to give controlling weight to the opinions of her treating psychiatrist, Dr. Legnon, and to properly weigh the opinions of Drs. Greenway and Friedberg.  The Court agrees.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

---

[2]As to claimant's hepatitis C, the ALJ believed that claimant had some problems resulting from treatment during a one-year period from mid-2012 to mid-2013.  (Tr. 33).  However, she noted that claimant had reported to her counselor on October 30 2012, that she was hepatitis-free and continuing her treatments, and had lab results from UMC indicating that her hepatitis C was undetectable.  (Tr. 723, 746, 791).  Additionally, she told Dr. Friedberg that she had been in remission from the disease for nine months as of December 2013.  (Tr. 815).  Thus, the ALJ concluded that claimant could not be disabled because she had not met the duration requirement.

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455.  "The opinion of a specialist generally is accorded greater weight than that of a non-specialist*." Id.* (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir.1994)).

Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *Id.*  The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  *Id.*

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Id.*; *Greenspan*, 38 F.3d at 237.

Here, claimant argues that the ALJ failed to properly evaluate Dr. Legnon's treating source opinions in accordance with 20 C.F.R. §§ 404.1527(c) and 20 C.F.R. § 416.927(c).  These regulations provide:

> Generally, we give more weight to opinions from your treating sources, since *these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)* and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

16

hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(emphasis added).  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

These regulations are construed in Social Security Ruling ("SSR") 96-2p, which

states:

[A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a *treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight*.

(emphasis added).

Claimant argues that the ALJ failed to give Dr. Legnon's opinions controlling

weight and failed to evaluate her opinions using the factors cited in the regulations.

In *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001), the court held that an ALJ must consider

the following factors before declining to give any weight to the opinions of a treating

doctor: length of treatment, frequency of examination, nature and extent of relationship,

17

support provided by other evidence, consistency of opinion with record, and specialization.  *Id.* at 621 (*citing Newton*, 209 F.3d at 456).

The ALJ acknowledged that Dr. Legnon's medical source statement would ordinarily be entitled to somewhat more weight that Dr. Friedberg's.  (Tr. 38, 823-24).  She noted that, in this instance, Dr. Legnon's opinions clearly indicated that claimant's mental impairments had adversely impacted upon her functioning to a significant degree.  However, the ALJ found that the extent of restriction posited by Dr. Legnon "seemed somewhat inconsistent with the actual treatment records."  The ALJ opined that, given the reports of claimant's feeling well, improvement with medication, the GAF rating,[3] along with her activities of daily living, claimant's impairment and functional deficits seemed squarely within the moderate range, which would be above the restriction level indicated by Dr. Legnon's comments.  Therefore, she gave some (but not significant) weight to Dr. Legnon's assessment.

Claimant argues that the ALJ did not consider all relevant evidence, but only the isolated comments referenced above.  She asserts that treatment records and opinions from Dr. Legnon and TMHC are the best longitudinal evidence regarding her functional abilities during the relevant period.  [rec. doc. 13, pp. 14, 16].

---

[3]The Commissioner has determined that GAF scores do not have a "direct correlation to the severity requirements of the mental disorders listings." *Miller v. Colvin*, 2016 WL 1178391, at *5 n. 12 (M.D. La. Feb. 25, 2016), *report and recommendation adopted sub nom. Cynthia Claire Miller v. Carolyn W. Colvin, et al*, 2016 WL 1223232 (M.D. La. Mar. 24, 2016) (*citing* 65 Fed.Reg. 50,746, 50,765-66 (Aug. 21, 2000))

Section 12.00(D)(2) of the Social Security regulations for mental disorders

provides:

> *Need for longitudinal evidence*.  Your level of functioning may vary
> considerably over time. . . . Proper evaluation of your impairment(s) must
> take into account any variations in the level of your functioning in arriving
> at a determination of severity over time.  Thus, it is vital to obtain evidence
> from relevant sources over a sufficiently long period prior to the date of
> adjudication to establish your impairment severity.  (emphasis added).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(2).

Claimant's records from TMHC, where Dr. Legnon treated her, date back to 2008.

These records show that claimant's condition fluctuated and even worsened up to the time

of Dr. Legnon's medical source statement dated January 13, 2014.  Treatment notes from

TMHC support Dr. Legnon's opinion, including the reports from September 30, 2009, in

which claimant reported increased anxiety, restless sleep, and upsetting dreams (Tr. 403);

December 16, 2009, in which she reported being "in a funk" (Tr. 401); January 13, 2010,

in which she complained of emotional dys-regulation, self-criticism and depression (Tr.

400); January 3, 2011, in which she reported inability to focus and feeling "really down"

(Tr. 394); July 26, 2011, in which she reported hallucinations of seeing snakes (Tr.  383);

August 5, 2011, in which she reported seeing dark, snake-like shadows and endorsed

thought broadcasting and passive suicidal ideations (Tr. 382); October 30, 2012, in which

she complained that her bipolar was "out of control," her nerves were "really bad," and

seeing things scurrying behind the couch, TV and bookshelf (Tr. 746); February 25, 2013,

in which she reported that her psychological medications were not helping her racing

19

thoughts, and that she could not focus or make decisions (Tr. 743); May 7, 2013, in which she complained of "crazy" sleep, "bad anxiety," "no energy, depressed, not taking showers like before or putting makeup on," and "[n]o task completion," and had "marked" symptoms and "minimally worse" global improvement (Tr. 807-08), and July 11, 2013, in which her mood was anxious, speech was rapid, severity of symptoms was "moderate," and global improvement was "minimally worse" (Tr. 803-04).

Despite these voluminous treatment notes from claimant's treatment providers at TMHC documenting claimant's condition, the ALJ relied on isolated comments from the record. The Fifth Circuit has instructed that "the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports her position. *Loza*, 219 F.3d at 393; *Stevenson v. Colvin*, 2015 WL 6396035, *4 (S.D. Tex Oct. 22, 2015).

The record reflects that the ALJ failed to consider all of the factors for discounting the treating physician's opinion under 20 C.F.R. §§ 404.1527(c), 20 C.F.R. § 416.927(c), SSR 96-2p, and *Myers*. Indeed, the majority of courts, including the Fifth Circuit, have concluded that an ALJ must consider *each* of the § 416.927(d) factors before rejecting or affording little weight to a treating physician's opinion. (emphasis added). *Robinson v. Barnhart*, 248 F.Supp.2d 607, 625 (S.D. Tex. 2003) (*citing Newton,* 209 F.3d at 456; *Myers*, 238 F.3d at 621). The ALJ did not do so in this case, which constitutes error.

20

Claimant further asserts that the ALJ failed to properly weigh the opinions of Drs. Greenway and Friedberg under 20 C.F.R. § 416.927, given the chronology of their respective evaluations and the ALJ's own assessment of her functioning in 2012 and 2013.

In the Decision, the ALJ gave "great weight" to the opinion of Dr. Greenway, but did not accord much weight (some but not significant) to the conclusions of Dr. Friedberg.  (Tr. 37-38).  Regarding Dr. Friedberg's assessment, the ALJ found that her medical source statement was "highly contrary" to the picture claimant portrayed in her treating source records.  (Tr. 37).  She noted that while Dr. Friedberg's detailed limitations might have been applicable at certain specific times during the past several years, those limitations did not appear to accurately reflect claimant's overall functioning *on a longitudinal basis*."  (emphasis in original).  (Tr. 38).

The ALJ continued by stating that the treating mental health center records "provide a unique perspective to the evidence in the form of a detailed, longitudinal picture" of claimant's problems.  She noted that the same could not be said of "one-shot" examinations such as that from Dr. Friedberg.  However, the Court observes that Dr. Greenway's opinion, which the ALJ gave "great evidentiary weight," was also a "one-shot" examination.  (Tr. 37).

Significantly, claimant told Dr. Friedberg that during the evaluation with Dr. Greenway, she had been emotionally more stable and feeling a bit more hopeful.   The

21

Court observes that the report from Dr. Greenway was issued on October 15, 2012 – more than two years prior to Dr. Friedberg's report.  During the interim, claimant's condition declined, which is supported by the records from TMHC, as well as UMC and OGH, documenting suicidal ideations, overdose attempts, panic attacks, and worsening symptoms.

As acknowledged by the ALJ, the records from claimant's treating sources at TMHC, where claimant was treated by Dr. Legnon, most accurately reflected claimant's overall mental health functioning on a longitudinal basis.  The most recent report from Dr. Legnon indicates that claimant had the following functional limitations either more than 50% of a work week, or between 25 to 50% of a work week: understand and remember detailed instructions; maintain attention and concentration for two-hour blocks of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary work routine without special supervision; work in coordination with or proximity to others without being distracted by them; make work-related decisions; complete a normal work-day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them, and respond appropriately to changes in a work setting.  (Tr. 823-24).

These findings are also consistent with Dr. Friedberg's evaluation, which was issued one month prior to Dr. Legnon's medical source statement.  Dr. Friedberg opined that claimant's ability to understand, remember, and carry out simple, moderate and detailed instruction would be negatively impacted by the severe and persistent symptoms of her long-standing bipolar disorder.  (Tr. 816).  She determined that claimant's ability to maintain attention to perform simple repetitive tasks for two-hour blocks of time, and ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek, would be "greatly negatively impacted" by her fluctuating mood swings.  She further opined that claimant had difficulty relating to others due to her intense mood swings, anxiety and low frustration tolerance.  (Tr. 817).

The Fifth Circuit has held that a finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time."[4]  *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002); *see also Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003) (*citing Singletary v. Bowen*, 798 F.2d 818,

---

[4]However, nothing in *Watson*  suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case.  *Frank*, 326 F.3d at 619.  Relying on *Singletary* and *Wingo v. Bowen* [852 F.2d 827 (5th Cir.1988)] and taking account of the particular and peculiar evidence before the ALJ, *Watson* required the ALJ to make a finding as to the claimant's ability to maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (*e.g.*, mental illness) nature of the claimant's alleged disability.  *Id*.

822 (5th Cir. 1986) (substantial evidence existed that claimant with various mental disorders could not hold a job); *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). As the court stated in *Frank*:

> *Watson* requires a situation in which, by its nature, the claimant's physical [or mental] ailment waxes and wanes in its manifestation of disabling symptoms.
>
> ***
>
> At bottom, *Watson* holds that in order to support a finding of disability, the *claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time*.  An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination.  Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added).  *Id*. at 619.

Here, the ALJ erred in failing to determine whether claimant was capable not only of obtaining employment, but also maintaining it.  *Watson*, 288 F.3d at 218.  The records from Dr. Legnon and Dr. Friedberg indicate that claimant could not sustain a job for a significant period of time, and her work history and medical records support that finding. *See Singletary*, 798 F.2d at 822; *Frank*, 326 F.3d at 621 (working in short spurts only does not constitute substantial gainful activity and the applicant therefore might qualify as disabled).  Thus, the ALJ's failure to properly weigh the opinion of Drs. Legnon and

Friedberg, as well as consider the effect of her mental impairments on her ability to do full-time work, constitute error.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **REVERSED**, and that claimant be awarded benefits as of June 4, 2012, the date her application was filed.

Signed this 16th day of May, 2016, at Lafayette, Louisiana.

_____

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

25